Good morning, Mr. Marshall. Please call the second case on the court's back. It please. Thank you, Mr Gainor, on behalf of the appellant. Honorable Justices and Mr. DiDomenico, I'm Audrey Gainor. I represent the appellant, Mr. William O'Connor. This appeal follows more than nine days of trial held over a five-month period before Judge Piconiak in Lake County. All of the issues on appeal are financial, although the parenting matters were initially contested at trial, they were ultimately resolved. Mr. O'Connor challenges the trial court's rulings on essentially four main issues. The first was the dissipation finding by the court and charge against Mr. O'Connor relating to the decline in value of his 401K plan during the pendency of the pre-decree action. The second is the inclusion of Mr. O'Connor's withdrawals from trust accounts for which he was both the trustee and the beneficiary. They were non-marital trusts and the court deemed that those withdrawals and future withdrawals would be income for the calculation of both maintenance and child support, both retroactively and prospectively. The third issue is a claim of dissipation relating to the non-payment of the mortgage for the marital residence which included real estate taxes relating to the family home during the pendency of the pre-decree action, as well as any allocation of shortfall as a result of foreclosure on that property. Finally, Mr. O'Connor challenges the calculation by the court of the duration of the maintenance and it exceeded the statutory guidelines, and he also challenges the specific calculation of the amount of child support. All of these issues, as I'm sure you're all aware, are generally garden variety issues that can arise in almost any divorce. What's extraordinary about this case is that I'm standing here before you on appeal because they were the way they were presented in the trial court, in the trial, the evidence that was presented and the findings that were made were not based on the evidence that was actually submitted to the court, and there was some misapplication of well-settled law. In regard to the 401k dissipation issue, normally dissipation and most commonly dissipation is a matter of one of the parties inappropriately spending money during the divorce. In this case, the dissipation resulted from the court believing and charging Mr. O'Connor with dissipation for the loss in value of his 401k account during the pendency of the divorce. Was this raised during trial? Yes, it was. I'm sorry, the issue that the account lost value? No, the issue of dissipation. It was argued in the final oral argument. It was not raised as a notice of claim of dissipation, which is one of the arguments we assert. And did Mr. make the same claim of dissipation for the first time in closing argument? Mr. did claim, make an allegation of dissipation against his wife during, I think, closing argument as well, and there was also no notice issued by Mr. O'Connor in regard to any dissipation. And Mr. didn't object to this claim being raised at the time, correct? Yes, he did in closing argument. The first time the dissipation word was set was in closing argument. There was not an objection raised in a closing argument. There were written closings submitted and there was also some oral closing arguments submitted. So he didn't know that there was going to be a claim of dissipation until the closing argument. So there's no objection to evidence relating to it because it didn't rise during the course of the trial. At the pleading stage, though, the issue of notice, of establishing notice of this claim, it really was not a relevant issue at that point, was it? The statutory authority had not yet been put in place. It's correct that the new statute was not applicable, which had a specific notice requirement, but as we argued in our reclined brief, the case law was well settled. That notice was required in order to be able to proceed and present evidence at trial on a dissipation claim. So since the evidence – so the statute, the legal requirement existed, although it had later been codified after the case had been filed. Does that answer your question? Well, yes. But the fact remains that during the course of the trial, there was testimony about this loss of value. There was testimony about Mr.'s claim against Mrs., although never called dissipation. There was some testimony, correct? There was testimony to the underlying facts, but those facts also pertain to multiple issues presented within the trial. Right. But so to say it was a surprise or it was objectionable to now call it dissipation, might that be a bit of a stretch when the testimony was there? No, because the issue, particularly in dissipation, is causality. So in regard to the 401K, the question is, why did the accountant lose value? There was no question that there were statements, and the only thing submitted to the court that it could consider were a handful of statements that were a subset of a period of time under consideration. None of those statements showed any changes, any decisions made, any investments that were altered. What it did have is a little graph that showed in a previous period of time the value of the account went up and then the value of the account went down. So you don't blend the issues. In any event, the dissipation argument was raised after the proofs were closed. That's correct. Okay. I see your point. Let's talk about the S&P, the court's ruling that there It seemed to me the court deemed the account to be underperforming in comparison to the S&P 500 index, correct? Generally speaking, that was his conclusion. Yes. That was his conclusion based on his judgment. There was no evidence presented as to what William actually did that was wrong. No. And that's your point. Correct. But there was evidence that he did something. He changed the allocation or the way money was allocated in that particular account, correct? Not specifically. There was one question and answer in the entire trial where Mr. O'Connor testified that it was his recollection that he generally, from time to time, changed allocations both before and after the petition for dissolution was filed. That's it. But it is a marital asset. Yes. And so when it occurs after the dissolution is filed or the petition is filed, it becomes subject to the court's, the court's got to do something with it, correct? Well, the court has to allocate 401K, sure. Right. And so the court will look at that value and say, what happened? I mean, maybe not to you, what happened, counsel? But in his or her mind, it's something that the court has to do.  And so the court will look at that value and say, wait, there's a change here. Why did this happen? Yes. And in fact, the court specifically asked that question of Mr. O'Connor, directed opposing counsel at that point in the trial, to say, well, the question is, did you make this change and did your actions cause the diminution of value? And the answer to that was no. Okay. And there was no other evidence provided to show that there was a particular change in the record. In regard to, so there was no evidence that showed that any action that Mr. O'Connor took caused the losses, and Mrs. O'Connor never established a ground and anchor that his actions caused the diminution of value. Because of that, the court basically didn't have a basis to say this is dissipation. There's no prima facie case established. There's nothing in the record on which the court can base his conclusion that Mr. O'Connor caused the losses. Once either one of them made a, used the word dissipation in closing argument, did anybody make a motion to reopen the proofs? No. Okay. The issue of the judicial notice that was taken of the S&P Index, again, this goes to Mrs. O'Connor's burden to show that, first, that Mr. O'Connor caused the losses, and I think the way she was trying to do it is to say, well, look, his account lost value during this period of time, whereas this general index did not lose value. But the way the judicial notice was handled was inappropriate. It was not an appropriate basis for judicial notice. It was the judicial notice request occurred in the closing argument itself, which can happen, but there was no foundation laid for the index that the court was requested to take judicial notice of. You can't just throw up anything that says S&P and say that this is a measure of how this particular account should have performed, and since it underperformed, it's therefore dissipation. Well, even if the foundation was improper, that's not really your argument. Your argument seems to be that the court just can't reach out and decide it's underperforming based on the S&P without a showing of something beyond that. Yes, that's true. If it doesn't end the inquiry just because it's not keeping up with the S&P doesn't mean it's dissipation. Correct. That's a zero. Yes, that is part of our argument. Correct. What about the trust information or the distributions from the trust? The distributions from the trust are a faction-specific and record-specific issue. So what happened here is that Mr. O'Connor received trusts from his family in 2005 during the marriage. There were a couple of trusts, and none of the trust documents were ever submitted into evidence. They are not in the record. The only thing related to the trusts that are in the record are statements that show the accounts that Mr. O'Connor uses. In the course of the pre-decree proceeding, Mrs. O'Connor asked that Mr. O'Connor pay attorney's fees for her attorneys from these trusts. At that time, the record again is pre-blank. There was an oral without a transcript. There is reference to an oral objection that Mr. O'Connor made saying, hey, I really can't take money out of these trusts. And so the parties agreed that Judge Verderstrauss, who was the trial judge at the time, would conduct an in-camera interview of the trust documents. The trust documents were not identified in any part of the record. All that we know is that Judge Verderstrauss did make her review of some documents that both parties agreed that she could look at, and she emerged from her review and issued an order stating that the court finding William O'Connor having absolute discretion with no restrictions to access to his trust funds. So that was the order from that point forward. There were many orders that then followed ordering Mr. O'Connor to take money out of those trusts to pay various attorney's fees throughout the period of trial, including the final judgment and award of contribution of attorney's fees. Were any other monies taken out of those trusts other than those by court order? Yes. Okay. Mr. O'Connor testified that from time to time he would withdraw money from those family expenses and to pay expenses for the trust, such as professional fees and taxes. All right. So did those distributions or withdrawals, depending upon how you want to look at it, take place before the court order as well as after the court order? Mr. O'Connor's testimony was yes. He didn't change his practice. So once the money is taken out and it is used, it's income. It's used for someone's benefit. It becomes income. And as long as those trusts have dollars in them and he has discretion to use those dollars pursuant to court order, why would that not be considered income for him? Because for child support and maintenance purposes, the question is, and this is under McGrath, why is it any different from any savings account? It was treated as a savings account. Judge Berger-Strauss found that he had unfettered discretion and access to this. He didn't have to report to anybody. He did not have a fiduciary duty to this next generation. She did not find that. This was already determined. So there is no factual or practical distinction between these trust accounts, which he controlled, and a savings account that he got from his father's estate. It would make no difference. So when we use the word income as a... If he got a savings account from his father's estate, wouldn't that then become income? I mean, at McGrath, it was a savings account that held the person's income. The person, you know, you get a check from a client, you put it in your personal savings account because you've earned that money. That's your money. And now to say that then once you take it out, it's income again, I mean, isn't that what McGrath said? Basically, it was this money that was sitting in a savings account had already been earned. That's why it was that person's money already. McGrath didn't say that it had already been earned. What McGrath said is that it had previously been awarded as an asset to the husband. McGrath was a post-decree case. So I don't really see a distinction between an inherited account and a savings account that you get in a divorce that you then are using post-decree. The source of the money... How does this case differ from for a minority marriage of Sharpe, where this court decided that trust distributions received by a respondent represented a monetary gain that increased his wealth and facilitated his ability to support his wife and child? Because I have to confess, I don't have... When we were in marriage with Sharpe, it wasn't cited by anybody in these briefs. So you would have to enlighten me as to whether Sharpe includes a trust that the beneficiary had complete control over. Well, it was a spendthrift trust. Once that money was taken out, the person could do whatever they wanted with it. Right. The spendthrift trust, there's a different trustee. And here, Mr. Mullen-Connor was the trustee as well as the beneficiary, and he had absolute discretion over it. But there is a significant difference in McGrath than what we have here. McGrath is post-judgment. This has already been awarded to him. The court knew about it. It now cannot be sort of double-dipped for purposes of income. In this case, this is the actual dissolution. The judge is finding out about the assets that are there. They are non-marital property. But non-marital property must be considered for purposes of maintenance, but more importantly for purposes of job support. Right. And the income from that is, but the actual distribution should not be because he already owned it. So if I just don't see the distinction, and maybe we just disagree, but I do not see the distinction between a savings account and this trust. And that's what McGrath said. It's not a matter of a savings account and this trust. It's when it was awarded. It was awarded as his property in the divorce, and now she wants to use it, she being the wife in McGrath, wants to use it for income. It can't be both. It's his property. The court knew about it, gave it to him, and considered support based upon the fact that he had this property. Now we're in a different posture. And I think that's the specific difference between McGrath, this case, and the Sharpe case. Well, I heard the bell. I'm more upset, but maybe I will say it. You'll have an opportunity to rebuttal. Say again. You'll have an opportunity to rebuttal. Thank you. All right, thank you. Mr. D. Domenico, on behalf of the appellee, you may proceed. Thank you. Justice Hudson, I'm going to please the Court if I may be Domenico for Kathryn O'Connor. I'm joined at counsel table by Attorney Heather Natsako who tried the case for Ms. O'Connor. Mr. Domenico, could you? Yes. Thank you. It's a blessing and a curse. Yes. I'll start where you started with Ms. Gaynor on the 401K issue and the dissipation. One thing that wasn't brought up is how on the account statements for the 401K that there was a suggested allocation for the assets on each of those statements. And it was 75% in stocks, 25% in bonds, and 0% in short-term reserves. That was a suggested allocation on every account statement that the judge looked at. The testimony was, was after the divorce was filed, Mr. O'Connor placed 100% of the assets in the short-term reserves. And that was the recommendation, again, was to put zero in short-term reserves. The testimony was that was not the marital status quo. The testimony was he did it after the divorce was filed. All right. We're going to assume there's a breakdown of the relationship once the divorce is filed. I'd agree. What are we using the funds for? That's the other issue. Actually, there's no distribution out of there. That 401K is standing firm at whatever the amount is. So we're not using that for a purpose not related to the marriage relationship. So how do we have a dissipation? I will concede that this, and it sort of started with the Shane White case, which came out of this district, this sort of genre in the dissipation context of bad investments can make dissipation. This is tricky because we have the benefit of post, you know, of after the fact, being able to look at it after the fact, whether it was a good idea or a bad idea. There's no question about that. But this is a manifest, the dissipation is still a manifest weight issue, and the judge gets to size up the testimony that was related to the redistribution of the assets. And this judge listened to Mr. O'Connor testify, and Mr. O'Connor testified that, well, sometimes the stocks go up, sometimes the stock market goes down. But he was entitled to weigh that in light of his uncontradicted evidence that he altered this allocation after the divorce was filed. So let's assume he's saying the argument that's correct, that obviously he did not follow the recommendations. That's essentially undisputed, correct? Correct. What evidence was there? What is the nexus between, had he followed, what was the proof that had he followed the recommendations, the loss would not have been sustained? Was there any tie in? He doesn't follow the recommendations, so is the evidence established that had he followed them, there would have been no loss? Was there any specific testimony on that, or do we presume that? I'm struggling with that proof issue. There was no, I don't know if there was a direct link, a smoking gun evidentiary link that you're talking about. The judge looked at the S&P and just, like any of us can go on the Internet and see how the S&P performed in a particular year. If you had just been a rational, economic, prudent investor and put it in the S&P, this is what you would have made. You would have made a profit. And that does have some intuitive appeal. But is that sufficient? Dissipation has to show something more than a mere loss. There's some excessiveness. There's something going on here. I think you sort of need to tie this up somehow. Is it proper for the judge to conclude he looks at the index? Your particular investment, what you did, doesn't meet the performance of the S&P. Therefore, ergo, it must be dissipation. Is that what the law says? I think that when you, the judge is entitled to take all the circumstances of the case into consideration and take into consideration that he did it after the divorce and that it was a departure from the marital status quo. Look, there's no doubt if you want to assume a rational, economic actor, nobody wants to tank their own account because he's losing money too. But if you look at this case, I'm not so sure that that's what you have here. This appeal has stayed for a year while we argued about garbage cans and bird feeders. I'm not so sure we can assume a rational, economic actor in the normal sense. But doesn't the trial court have to set an amount of dissipation? I mean, a dollar amount? This is how much the dissipation was? Your case law actually says no. Your case law actually says a specific dollar. I think it's the Tavisong case, if I'm not mistaken. I think that that case says that a specific number isn't actually required. The court can just say, I find dissipated assets and take that into consideration in allocating what's left of the marital estate. Now, here, the judge did actually assign it. Where did the judge go? He judged it here. He actually did. He said effectively the number was $100,000. It was $30,000 for the 401K in round numbers and then $100,000 related to the dissipation for not paying the mortgage. In most instances, it would be $50,000. You divide it in half, you get over $50,000. Here, the judge just equitably said pay her $30,000. Getting back to Justice Hudson's question, isn't that against the manifest way of the evidence if there's nothing that ties the lack of following recommendations to a dollar amount? I don't see an evidentiary problem with looking at the S&P like the judge did. I think you can take notice of that. Anybody can determine what the S&P, how the funds would have performed over the same period of time. That's well understood information. The proof otherwise, what would have been required? My side would have had to have had an expert testify that if it was allocated the way it was suggested or was allocated the way it was before the marriage, it would have been this. I don't know if that would have been cost effective to anyone. The word that you used a couple of times is the evidence. There is no evidence other than the S&P was more successful than this allocation of assets. It came up in closing argument. You didn't ask to reopen either, did you? No. Okay. So essentially, and the court can, as we know, go to popular public sources to look for information, but needs to relate that somehow to this asset. And how did he relate it other than had you not changed this, you would have made money? That was the finding. And that was the finding that he made. That was the finding that he related it to the S&P because the 401K was stocks and bonds, right? That's typically how you invest in the S&P anyway. So that was the judge's drawing on public information common knowledge to make the comparison. Did it go outside the record? I can't argue with that point. But again, if dissipation is a manifest way issue, I think the judge is entitled to consider all of these circumstances at the same time, and that's the timing of the change, the fact that it was specifically recommended that he allocate this in the exact opposite way, not to mention that Mr. O'Connor worked for FINRA for almost 20 years. FINRA is the arm of the government. I mean, these are the people that went off and, again, stuck on Bernie Madoff. These are financially sophisticated people. And I think the judge was entitled to consider all of that in light of the decision to reallocate the 401K and find the dissipation that he did. Let me understand your argument. Let's move to the next very significant issue. In my mind, opposing counsel has argued that the child court erred as a matter of law in considering the withdrawals from the FUST accounts as income for child support commitments. Okay? What is your position on that? I have two positions. One, Justice Hutchinson hit on already, was that the posture of this being pre-decree is a little bit different than McGrath, because the primary argument, as I understand it, is McGrath, McGrath, McGrath. This is a savings account, and that's the end of this. This isn't the post-judgment asset that was already awarded to him. This was another asset being taken into consideration in the support and maintenance package that the judge put together, and that's 504 says that. It can be paid for in assets, 505. Child support certainly says the same thing. Specifically, doesn't Sharp control this? Isn't the salient consideration, when is it a distribution to the payor? Certainly, trust can be immunized from income if, in fact, it is a trust where the payor doesn't have the right to withdraw. When it's in the trust, obviously, it cannot be used by him. Therefore, it can't be income. But once it is distributed to the payor, doesn't it become income for all purposes? I would agree with that. Do you agree with Sharp? I am. The only other thing I wanted to point out on this record was that the account statements, and Judge Peconiak identified all of these trusts as generation-skipping trusts, which were funded by when Mr. O'Connor's father passed. These were funds for the children, the four kids in this case. And a generation-skipping trust means Mr. O'Connor, as the record shows, was the beneficiary and the trustee. This business about access to the trust, of course he had access to it. He's the trustee. That isn't dispositive of anything. He's the trustee. Of course he's going to have access to it. He wanted orders blessing the withdrawals for the fees because he knew otherwise invading the assets without a court order might leave him in a precarious position with his children one day. And so to analogize this, the way I was thinking about it, besides that it's an asset anyway in a pre-decrease setting, is that this is money that already belongs to his children anyway. And so to say that this was money that wasn't his, it's just not accurate. It may not be his, but it becomes his when he withdraws it, doesn't it? That too. That's oversimplified. That's what Sharfstein's vindicated. And I think you're making my point even better than I am in much more simpler terms. And when he withdrew prior to the court orders, what does the record show he used that money for? Personal expenses. Some family expenses as well. When you say personal expenses, were they living separate and apart throughout most of this period of time? They were. The questions were put to him, but the answers were vague. But it was generalized family expenses. I don't think the record suggests any reason to doubt that. Probably some personal expenses, some separate living expenses, but so be it. Can I move on to the next issue? The counsel didn't touch on it, and she can in a moment, but the marital residence expenses. Yeah. You know, this was an agreed order that was entered January 22 of 2014, correct? Correct. Did the trial judge in this case make a finding that that order was ambiguous? No. I think quite to the contrary. He found that Mr. O'Connor was obligated to pay the mortgage pursuant to that order, the January 2014 order and a prior order. So in the sense that he didn't make a finding that it was ambiguous because he said that both orders obligated him to do that. So the order that was entered that says that your client was responsible for all expenses related to the marital residence was unambiguous that he had to pay the mortgage. Let's talk about what it actually says in that reading. This is paragraph 3 of the January 22, 2014 order of C-219. That the petitioner, that's me, that's my site, Catherine O'Connor, shall be responsible for all expenses related to marital residence and the auto expenses from January 1, 2014 to date. To date. With retroactive adjustment to May of 2013. To date. Doesn't say going forward, does it? It says to date. Paragraph 5 of the same order says the final retroactive adjustments of the prior payments from May of 2013 to December of 2013 shall be made in the final settlement. The way I understand this order is this was, Mr. O'Connor came to court to try to modify the temporary support. They reached an agreement effectively to give him some sort of credit for May to January for the mortgage. This order doesn't say from here on out Catherine O'Connor has to pay the mortgage. Why in the world would she ever agree to that? As we take pains in the brief and as Judge Poconi found, she had no prayer of paying the mortgage and feeding these four kids on the money that he was giving her. And she had no other income. Why would he agree to this then too? Because he's basically throwing himself on the mercy of the court filing this petition on May 21 of 2013 saying, I don't have the money to pay a $1,600 support payment plus the $2,200 mortgage payment. So then he enters in a green order a couple months later, put him on the hook for over $2,000 of child support, over $650 in maintenance plus the $2,200 mortgage on what I believe was found to be a net income of $5,100 a month. Where is he getting the money? Your Honor, the funds in this family were thin to begin with. And I'm only going by what this order says because that's the argument on the other side. The argument on the other side is that this order says that she was supposed to pay the mortgage from here on out. That isn't what it says. And as Judge Poconi found, that's not even a reasonable interpretation of the order in light of the fact that she had no possibility of paying that and taking care of the children on this amount of money. Why would he even consider what her income was? Consider what my client's income was? Right. The argument was advanced that this order meant, the argument was made at trial that this order meant what there are other things that she may do. What I'm saying is you already argued or said your position that the trial judge found that this was unambiguous. So the trial judge shouldn't go past the words on this order and shouldn't look at her income, shouldn't worry about her ability to pay. I thought, I understood your question to be what did the judge find. That's ultimately how I understand his judgment, that the order didn't require that, that the order did not require that. So to me that means it was, he found it wasn't, he was, it was not ambiguous. I know that the rest of the judgment goes on to consider her income, but whether or not it's ambiguous or not, the cases suggest that in the context of interpreting agreed orders, the court can take into consideration all of the facts and circumstances that went into making the order. These are 501 orders. These are temporary orders. These are done without evidence, often as band-aids on the way to trial. And when you get to your final merits hearing, the judge is entitled to consider all of these types of considerations and to allocate the expenses of the family. Which judge entered this agreed order that's at issue? I don't think it was Judge Pecone. Was it? I don't believe so. I don't think it was. Okay. It wasn't Judge Pecone. He got the case for, I think he was a floater that day when this case got assigned, because I think Judge Pecone asked that criminal judge. I'm just curious. Is this, he's, I'm sorry, she's on the hook for all the expenses related to narrow residence and the auto expenses from January 1st to date with a retroactive adjustment to May 13th? How's that retroactive? Judge Pecone had the same struggle, I think, that everybody else has with what this order even says. A lot of it isn't even legible and what it means. I take it to mean that they settled this temporary support modification dispute by giving Mr. O'Connor a credit for May of 2013 to date. That's how I understand this deal that was made. I don't see it as anything else. Do you agree that all expenses re-demand of residence would include the mortgage, the utilities, everything, correct? I can make an argument that, you know, common parlance is mortgage taxes and expenses, and expenses means the lights and the heat and your Internet, et cetera. But all tends to mean all in the law. But I don't think we need to get there because I don't think. Is there any evidence in the record, apparently the foreclosure stuff started after this order, correct? Yeah. I mean, the problems with the payments. So somebody was paying this mortgage up until January this order was added. Correct. And is there any evidence in the record that A, he paid it and B, she paid him back for the, you know, for the time? I don't think there's anything that establishes that one way or the other. Thank you very much, Mr. Domenico. Thank you. Ms. Gaynor, you may address the Court in the above. Thank you. While we, as you can see, we're busily trying to find all the little needles in the haystacks here. Yes, I noticed that you're busy looking for papers. I have a couple things to say in regards to the trust accounts. I'm a little concerned about the characterization of the trust that were not marital, that were awarded to Mr. O'Connor in the final judgment, which is correct, as well as the use of them during the marriage, the use of them during the pre-decree proceedings, and then how distributions will be treated post-decree or withdrawals, however we term that. First of all, because the justices seem to be concerned about whether it is the same as the Sharpe trust, and again, both opposing counsel and I are at a disadvantage in the sense that we haven't recently read the Sharpe case and don't know exactly how it would apply here. I think it's on point. That's the problem. Perhaps you're not familiar with it, but Sharpe stands for the proposition, thus the trust income once distributed to pay your, under the terms of the trust, could be used for any purpose, including the payment of the child support and maintenance obligations. Sharpe seems to be on point. There's no dispute that, as I said, it could be immunized from being used or attached as income for support and maintenance when it's in the trust. When somebody gets a withdrawal, it's theirs to use for whatever purpose. And because, as you well know as a practitioner, income for the only purposes of child support and maintenance are very broad, the courts have decided you can use it for whatever you want. You can't say it's not yours to use for child support or maintenance or any purpose. Right. But in this case, Mr. O'Connor was ordered to make distributions to himself from the trust. So he would then get this double count where he's ordered to take money out to pay expenses for the family or to pay attorney fees expenses. And then the justices seem to be suggesting that, well, if he's ordered to withdraw money, he then has to pay support on top of the money that he's ordered to withdraw. Further, if this is a savings account, which it is an investment account that he controls, that he has unfettered access to and control over, that if it is awarded to him, if it is analogous to McGrath and if it is awarded to him as an asset, which it was here, then for post-decree purposes, it's already been considered. Now, there is no evidence here, at least as I can find it, that Judge McCormack used the orders saying you shall pay these attorney fees as some evidence of how much money he has to use. What the judge said is if he takes money from these accounts other than the orders for himself or for family means, that is income. And if that's income, then in the future, if he takes money from that, that is income. We're not – I don't think any of us are saying because he was ordered to take money out, the judge is using this now as an income source. That's separate. That's why I asked you, did he take money out before he was ordered to take money out? And you said yes. And that's, I'm sure, what Judge McCormack was considering. And it is very different than McGrath and it's very on point, I think, with a 12-year-old case called Sharp. Okay. I will move on to just to hopefully correct some errors in regard to the 401k testimony and evidence that was actually in the record. There was no evidence in the record anywhere as to if and when mutual funds were liquidated and placed into short-term reserves. The record is void on that. So the statement that Mr. O'Connor, at some point during the marriage, I'm sorry, during the pendency of the case, did not follow the recommendations of the investment house, there is no evidence when he did that, assuming that he did do that at some point. So there's no evidence as to the timing of the placement of those funds into the reserves. It's just not there. But we have statements from those accounts that indicate it happened. No. The statements do not do that. Well, then where did the evidence come from? It didn't. There is no evidence. All there is is that the investments were in short-term reserves. It doesn't show when they were placed in short-term reserves. And Mrs. O'Connor could have submitted evidence. They did discovery for a long time. She could have developed this evidence and she just did not. In regards to, and maybe the Court is not covered by this, as to whether the children are the beneficiaries, I'm, again, concerned about the evidence that is in the record. There is no evidence submitted to the record about who those, what the children were entitled to, what the terms of the specific trusts were, and what the fiduciary duties of Mr. O'Connor were to his children, if any. And so that just was not submitted. Again, this is evidence that could have been submitted, and it was not to the extent that the Court was concerned about those fiduciary duties. I'm sure that that was not. I did, I just, I'm going to ask about your take on this order that says that apparently Mr. O'Connor's attorney, who at the time wasn't that well, has drafted this order that the Petitioner shall be responsible for all expenses which read the marital residence and her auto expenses from January 114 to date, with retroactive adjustment to May 13. Please tell me what that means. Well, I started on the prior page of that order, which says that we start with the preamble, that it's coming before the Court on multiple feedings, and the parties have entered into settlement negotiations. Then in Paragraph 1, towards the bottom it says that the court order of 918.12, which is the previous temporary support order, is hereby modified retroactively from May of 2013 going forward as follows. So we understood that to be the modification period, so that when you look at this phrase on the next page in Paragraph 3, the expenses from January 1, 2014 to date, that that was not a three-week period that Mrs. O'Connor would be responsible for those expenses. You'd have to read the order in its totality. That would make more sense if, in fact, Paragraph 3 was actually Paragraph sub-C under 1. Then you would say that, okay, we're modifying this order and we're modifying it on child support, maintenance, and household expenses. Okay, that's not what it says. We've got a Paragraph 1 that talks about modifying that order. Then Paragraph 2 goes on to something different, and then Paragraph 3 talks, you know, it's what I just read to you. Well, we understood it to be a modification going forward, and I did want to correct one of the questions and answers during Mr. DiGennico's time, which is that nobody was paying this mortgage not from January of 2014 but from May. So part of the reason why there was a retroactive period is because the mortgage had stopped, the mortgage payments had stopped in May, and that's why Mr. O'Connor sought the sale of the residence to try to mitigate the damage that was being done to the estate. But in terms of the confusion that seems to arise between Paragraph 1 and Paragraph 3, as Your Honor has pointed out, the only way that this makes sense is for this to be a change going forward. And my expectation would be that the marital residence, the auto expenses from January 2014 to date was intended to me to go forward. It wasn't a limiting – it would make no sense to allocate expenses for a 3-week period in a comprehensive order of this nature that's modifying all of these support payments. Well, would you agree that that's at least ambiguous as to what the heck that paragraph means? I wish I could disagree, but I think I'm going to have to agree that it is ambiguous. Thank you, Your Honor. Thank you. All right, I'd like to thank all parties for calling the arguments here this morning. The matter will, of course, be taken under advisement, and a written decision will answer in due course. We thank you very much. We stand in adjournment for the day subject to call.